UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* Steve Karol and Steve Karol, Individually,<br><br>Plaintiffs,<br><br>vs.<br><br>L-3 COMMUNICATIONS VERTEX AEROSPACE, LLC,<br><br>Defendant. | Civil Action No. 3:10-CV-339-P<br><br>**JURY TRIAL DEMANDED** |

## FIRST AMENDED COMPLAINT

### INTRODUCTION

1.     Plaintiff Steve Karol brings this action on behalf of the United States of America (the "United States") and against Defendant L-3 Communications Vertex Aerospace, LLC ("L-3"), seeking treble damages, civil penalties, and other relief arising from L-3's false claims made in violation of 31 U.S.C. §§ 3729 *et seq.* (the " False Claims Act").

2.     Commencing on or about July 1, 1997, L-3 contracted with the United States to provide critically important "modifications, maintenance, or repair on various DOD (Department of Defense) weapons systems and support equipment at world-wide locations." (Contract No. F34601-97-D-0425) (the "1997 Contract").  The 1997 Contract was extended and, in 2002, work order number 32224756 was issued expanding the contract to include the maintenance of military helicopters in Iraq and Afghanistan.  On or about January 30, 2009, L-3 entered into a contract, Contract Number FA8108-09-D-0005, with the United States Department of the Air Force to provide helicopter maintenance in the South West Asia ("SWA") Theater of Operations,

which included Iraq, Afghanistan, Egypt and Kuwait from February 2, 2009 through November 5, 2011.  A copy of Contract Number FA8108-09-D-0005 , between L-3 and the United States (the "2009 Contract") is annexed hereto as Exhibit 1 and made a part hereof.  Pursuant to the 2009 Contract, like the 1997 Contract commencing in 2002, L-3 was contractually obligated to provide critically important maintenance of the helicopters used by United States military personnel in combat operations in Iraq and Afghanistan. The United States entrusted the lives of its service personnel to L-3, relying on L-3's representations that it was providing verifiably qualified mechanics to maintain these complex aircraft.

3.      Instead L-3 implemented a fraudulent proficiency testing scheme for L-3 aircraft mechanics and falsely certified that L-3 aircraft mechanics had demonstrated the required knowledge and understanding of various processes and equipment. To add insult to injury, L-3 charged the United States for the time spent "training" and "testing" these mechanics when no such legitimate training or testing took place.

4.      In addition, in a fraudulent effort to increase its profits by hundreds of millions of dollars, L-3 perpetrated a scheme to cause the United States to pay L-3 for services that were neither required nor rendered by falsely presenting to the United States and falsely certifying to the United States the number of manhours expended by L-3 aircraft mechanics in performing the helicopter maintenance contracts.

5.      By reason of the foregoing, L-3 knowingly presented, or caused to be presented hundreds of millions of dollars of false and fraudulent claims for payment or approval to the United States and supported those false and fraudulent claims by submitting hundreds, if not thousands, of false records and statements to the United States.

6.      The United States paid L-3's false and fraudulent claims, believing them to be legitimate.  By reason thereof, the United States sustained significant damages in an amount to be proven at trial, and is entitled to recover three times the amount of the damages it sustained, civil penalties and other relief.

## JURISDICTION AND VENUE

7.      This action arises under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, and the Court has subject matter jurisdiction over this action pursuant to 31 U.S.C. § 3732(a).

8.      Venue exists in the United States District Court for the Northern District of Texas pursuant to 28 U.S.C. § 1391(c) and 31 U.S.C. § 3732(a) because the L-3 transacts business within the District.

## PARTIES

9.      Plaintiff Steve Karol is a citizen of the United States and is a resident of the Town of Derby, County of Sedgwick, State of Kansas.  Mr. Karol is a veteran of the armed services and an experienced helicopter pilot and mechanic.  Mr. Karol originally served the United States for three years in the United States Army including service in Vietnam as a heavy wheel vehicle driver and infantry soldier.  After his service in the United States Army, Mr. Karol served nine years in the United States Air Force in helicopter maintenance where he achieved the rank of Technical Sergeant (E-5).  After his service in the United States Air Force, Mr. Karol rejoined the United States Army, where he was a warrant officer candidate and was trained to fly helicopters.  Mr. Karol was honorably discharged from United States military service.  Mr. Karol is a licensed Airframe and Powerplant ("A&P") mechanic and has spent a total of seventeen and one-half years in helicopter maintenance and repair.

10.      Mr. Karol began working for L-3 as an A&P Mechanic in October 2003.  Mr. Karol was assigned to perform aircraft maintenance in Iraq on United States military helicopters

under L-3s contracts with the United States. During his tenure with L-3, Mr. Karol was stationed at numerous Forward Operating Bases ("FOB") in Iraq, including Q-West, Mosul, Sammara, Kirkuk, Al-Asad, Al Taji, and Tal Afar. Mr. Karol is still employed by L-3, and since August, 2011, has been on disability awaiting and, recently, recovering from knee replacement surgery for injuries suffered while working for L-3 in Iraq. During parts of 2009, L-3 gave Mr. Karol management responsibility for safety and training of L-3 mechanics at Tal Afar.

11.     Mr. Karol has direct and independent knowledge of the allegations set forth in this Complaint. If a public disclosure of Mr. Karol's allegations was made prior to filing this action, which Mr. Karol expressly denies, Mr. Karol is nevertheless the original source of any such allegations or disclosures. Prior to filing this action, Mr. Karol made a full and complete disclosure of all material information known to him to the United States Attorney for the Northern District of Texas as well as to other representatives of the United States. Mr. Karol commenced this action under seal on February 12, 2010. On November 28, 2011, the United States elected not to intervene in this action and, on December 2, 2011, this Court ordered the Complaint to be unsealed. Mr. Karol served process on L-3, after which the parties stipulated, and this Court ordered, that Mr. Karol has until June 11, 2012, to file his First Amended Complaint, and L-3 has until August 10, 2012, to answer or otherwise respond to Mr. Karol's First Amended Complaint.

12.     Mr. Karol has commenced this action on behalf of the United States because the United States' funds were paid to L-3, pursuant to contracts between L-3 and the United States, including, but not limited to, the 1997 Contract and the 2009 Contract, as a result of L-3's false

records, L-3's false certifications, and L-3's false claims in violation of the False Claims Act and 18 U.S.C. §1001, as alleged in this Complaint.

13.     L-3 is a corporation organized and existing under the laws of the State of Delaware, maintaining its principal place of business in Madison, Mississippi, and is engaged in business in the State of Texas and specifically in the Northern District of Texas and elsewhere. L-3 was founded in 1977 as Beech Aerospace Services, Inc. In 1995, L-3's name was changed to Raytheon Aerospace LLC and it was owned by Raytheon Company. On June 27, 2001, Raytheon Company sold 73.5% of L-3 to Veritas Capital. In June 2003, L-3's name was changed to Vertex Aerospace, LLC. On December 1, 2003, L-3 Communications Holdings, Inc. acquired L-3 and changed its name to L-3 Communications Vertex Aerospace, LLC. In this complaint, L-3 Communications Vertex Aerospace, LLC and its predecessors are referred to as L-3.

## ALLEGATIONS OF FACT

A.     **Overview**

14.     At all relevant times from at least 2002 through at least November 5, 2011, L-3 provided aviation and aerospace technical services to the United States, including maintenance and repair of United States military helicopters in Iraq and Afghanistan pursuant to contracts between L-3 and the United States.

15.     On or about January 30, 2009, L-3 entered into the 2009 Contract to provide helicopter maintenance and repair in the SWA Theater of Operations, which includes Iraq, Afghanistan, Egypt, and Kuwait, from February 2, 2009 through November 5, 2011. The total estimated value at inception of the 2009 Contract was $579,050,827.73. *See* Ex. 1.

16.     The Performance Work Statement ("PWS") appended as Appendix A to the 2009 Contract established the requirements for Contract Field Teams ("CFT") to perform aviation

maintenance and repair pursuant to the contract.  A copy of the PWS is annexed hereto as Exhibit 2 and made a part of hereof; Section 3.2.3 of the PWS provided that "Standard Operating Procedures (SOP) will be utilized when a specific requirement is not stated in the appropriate manuals."

17.     L-3 submitted its SOPs to the United States for approval under the 2009 Contract. As provided in Item 10 of SOP A-2, any special requirements or deviations from Standard Operating Procedures must be defined by Local Operating Instructions ("LOI"). SOP A-2, Item 10 is annexed hereto as Exhibit 3 and made a part hereof. The United States reviewed L-3's SOPs and approved the procedures by letter dated January 9, 2009.  A copy of the letter is annexed hereto as Exhibit 4 and made a part hereof.

18.     Pursuant to the 2009 Contract, L-3 was required to certify periodically that it was performing as required under the contract and "in accordance with applicable technical manuals and the respective Performance Work Statements (PWS)" by completing a Certificate of Completion and Acceptance ("COCA").  For Example, copies of thirteen (13) of L-3's completed COCAs, are collectively annexed hereto as Exhibit 5 and made a part of hereof.

19.     As explained more fully below, L-3 knowingly failed to comply with training standards established by contract for its aircraft mechanics in Iraq and Afghanistan, knowingly falsely certified the proficiency of its aircraft mechanics in Iraq and Afghanistan, and knowingly made false reports regarding the type of work performed and the amount of time worked by its personnel under its contracts to provide helicopter maintenance and repair in Iraq and Afghanistan.  L-3 falsely certified performance as required by its helicopter maintenance and repair contracts with the United States in order to obtain excessive, unjustified payments from the United States.  L-3 knowingly submitted false claims to the United States because L-3

was fully aware at the time it submitted those claims that it had (i) failed to train properly its aircraft mechanics, (ii) failed to assess properly the proficiency and competence of its aircraft mechanics and (iii) falsely certified the manhours expended in performance of its contracts. In doing so, L-3 violated the False Claims Act and 18 U.S.C. § 1001.

**B.**   **False Claims Resulting from L-3's Practice of Falsifying Test Results**

20.    L-3 failed to comply with its own policies and procedures for training aircraft mechanics in Iraq and Afghanistan, violated its contracts with the United States, and knowingly and intentionally disguised its failures and violations  by creating false training records, including false certifications that L-3's mechanics had demonstrated their competence to perform critical maintenance and repairs on military aircraft. L-3 subsequently directed those mechanics, whose proficiencies L-3 knew had been falsely certified by it, to perform specialized maintenance and repair services, that L-3 knew they were not qualified or competent to perform, on United States military aircraft.

*1.*   ***Testing and Certification Requirements under L-3's Contracts to Provide Helicopter Maintenance and Repair Services to the United States***

21.    The PWS obligated L-3 to "ensure quality service is maintained throughout the life of the task order" and, more specifically, to prepare and implement a Quality Control Plan ("QCP") (Ex. 2, Section 6.3).

22.    L-3 was obligated to follow detailed training, testing and certification procedures to ensure that its personnel who performed critical, specialized tasks, such as military aircraft maintenance, were properly qualified and certified to perform those tasks. The specified procedures were set forth in L-3's SOP QA-26, a copy of which is annexed hereto as Exhibit 6 and made a part hereof, and in L-3's LOI SWA S-26, a copy of which is annexed hereto as Exhibit 7 and made a part hereof.

23.     L-3 was required to qualify and to certify aircraft mechanics in accordance with applicable military specifications, standards and technical publications before the mechanics performed maintenance without supervision. (*See* SOP QA-26, Item 8(b) in Ex. 6; LOI SWA S-26 in Ex. 7).  Prior to permitting a mechanic to perform specified aircraft operations and processes, such as flight control rigging, tire and wheel maintenance, brake riding, ground handling, and jacking devices, L-3 was required to ensure that the mechanic had been properly trained and certified to perform those critical tasks. (*See* LOI SWA S-26, Item 1(C) in Ex. 7).

24.     A mechanic's competence to perform was required to be objectively established through "an operational demonstration of special equipment and/or by satisfactorily completing a written and practical examination as required by the applicable military specification, standards, and technical manuals." (SOP QA-26, Item 10(a) in Ex. 6).

25.     Where a written test was used to evaluate a mechanic's competence to perform a process or operation on specified equipment, the mechanic was required to correctly answer 85% of the questions on the applicable test, which was required to include a minimum of fifteen questions.  (SOP QA26, Item 10(b) in Ex. 6).

26.     Proper administration of these tests ensured that L-3's aircraft mechanics had the prerequisite knowledge necessary to maintain and to repair adequately and safely aircraft used in the combat theater by United States military personnel. The qualification test was required to be administered by the site supervisor/team leader or other authorized instructor.  (SOP QA-26, Item 10(d) in Ex. 6).  L-3 represented to the United States in its LOI SWA S-26 that site supervisors were responsible for test administration procedures and that answer keys were maintained as controlled documents in order to ensure the integrity of the certification process. (*See* LOI SWA S-26, Item 3.A in Ex. 7).

27.     After the supervisor/team leader or instructor determined that the mechanic had demonstrated proficiency on a given process or operation, the instructor certified that the required training had been provided and that the mechanic had demonstrated the required knowledge and understanding.  The certification was provided on Form CFT 405, "Qualification, Training & Certification."  (SOP QA-26, Items 5, 10(e) in Ex. 6).  A copy of a completed CFT Form 405 is annexed hereto as <u>Exhibit 8</u> and made a part hereof.

28.     Each CFT Form 405 was required to be kept on file detailing the operations and processes in which a particular employee had been found to be proficient.  (SOP QA-26, Item 10(e) in Ex. 6).  One copy of the form was required to be forwarded to the L-3 Quality Office, originally in Oklahoma City, Oklahoma, and, subsequently, in Madison, Mississippi, and one copy was required to be retained in the employee's training file at the site for the duration of the mechanic's employment with L-3.  (SOP QA-26, Item 10(e-f) in Ex. 6).  When an employee was transferred, the employee's qualification training and certification file was required to be forwarded to his new work site.  (SOP QA-26, Item 15(a) in Ex. 6).  The SOP mandates that the records be made available for inspection by the Government Quality Assurance Representative and Project Officer upon request.  (SOP QA-26, Item 15(c) in Ex. 6).

29.     Proper administration of qualification tests was essential to ensure that L-3 aircraft mechanics had adequate training, knowledge and understanding of the process and equipment necessary to safely maintain and repair aircraft used in the combat theater by United States military personnel.

### 2.     *L-3's Falsification of Training Records*

30.     Despite detailed SOP's and LOI's setting forth the requirements for certifying aircraft mechanics on specific operations, processes, and equipment, L-3 ignored those procedures and, instead, implemented a sham training and proficiency testing program.  Through

its implementation of its fraudulent training and testing scheme, L-3 knowingly (i)
misrepresented the qualifications, abilities and certifications of L-3 mechanics, (ii) made and
maintained hundreds of false records, and (iii) allowed untrained, unqualified and improperly
certified personnel to perform services that were critical to the safe operation of military aircraft.
L-3's sham training and testing violated the terms of its contracts with the United States and the
False Claims Act, and put the lives of United States military personnel at risk.

     31.     Mr. Karol personally observed L-3 instructors engaging in sham proficiency
testing at each of the seven Forward Operating Bases at which he was stationed with L-3 in Iraq
during his seven years and ten months there.  Rather than requiring mechanics to demonstrate
competence by independently completing an objective test on each subject, L-3 routinely
provided each mechanic with the correct answers at the time of, or before, taking the test.
Each mechanic was expected to copy the correct answers onto his own CFT Form 405, so that it
would appear that he was well-qualified to perform the operations covered by the test regardless
of his actual proficiency.

     32.     After the mechanic copied the answers onto his CFT 405, the instructors then
"graded" and signed the mechanic's CFT Form 405, falsely certifying that the mechanic had
been given the specified training and had demonstrated the required knowledge and
understanding.  The record falsely certifying that the employee had demonstrated mastery of
the subject was then placed in the mechanic's file, and the mechanic was considered by L-3 to
be competent to perform the designated operations without supervision.

     33.     Tests were administered by the Site Supervisor, or by the Team Leader or by
another designated instructor.  Upon successful completion of the test, the instructor signed the
employee's CFT Form 405 attesting as follows: "I hereby certify that I have provided the above

Qualification Training in accordance with the above-references and the employee has demonstrated the required knowledge and understanding." *See* Ex. 8.

34.     During his seven years and ten months working for L-3 in Iraq, Mr. Karol took numerous proficiency tests. Virtually every time that Mr. Karol was given a test by L-3 during those seven years and ten months, an L-3 employee gave him the answers to the test before or with the test. Mr. Karol personally observed this fraudulent testing practice at every FOB at which he was employed by L-3.

35.     On March 13, 2010, Dale Wright, Second Shift UH-60 Black Hawk Team Leader, instructed Mr. Karol to complete a packet of eleven CFT-405 Qualification Training & Certification forms. The CFT-405 forms allotted one full hour to each individual training requirement. Mr. Karol took only a total of forty-five minutes to complete all eleven.

36.     Four of the CFT-405s required Mr. Karol to complete a multiple choice test. The four required tests were: (1) Hazard Communication Training; (2) Corrosion Control Test, Activity code 241, Function Code EL; (3) Methylyne Chloride (Specific Risk), Activity Code 520, Function Code MA; and (4) Safe Handling, Compressed Gas Cylinders, Activity Code 241, Function Code SL. For the first time in Mr. Karol's experience in Iraq, the tests were provided without the answer sheets. After completing the first test - which he passed - Mr. Karol decided to purposely fail the following three to see what would happen next.

37.     On March 15, 2010, Mr. Wright informed Mr. Karol that he failed the three tests and would have to retake them. Mr. Wright handed Mr. Karol his original answer sheets with the correct answers marked and instructed him to copy the correct answers onto new forms. Mr. Karol complied, which took no more than a few minutes, and handed the original testing forms along with the new testing forms back to Mr. Wright. Mr. Wright then took the original failing

forms and threw them in the trash and placed the new passing forms in Mr. Karol's file.  Mr. Karol retrieved his original failing forms with the correct answers marked, copies of which are collectively annexed hereto as <u>Exhibit 9</u> and made a part hereof.

38.     Seven of the CFT-405s were "read & sign" meaning that L-3 was supposed to provide the relevant reference documents for Mr. Karol's review, and upon completion Mr. Karol would then sign the form indicating that he received and understood the training provided. The seven "read & sign" CFT-405s were:  (1) Local Operating Instructions, Activity Code 520, Function Code ST; (2) Corporate EH&S Policy No. 5; (3) Fall Protection, Activity Code 520, Function Code OU; (4) Forklift Test, Activity Code 520, Function Code EQ; (5) Alodine (Specific Risk), Activity Code 520, Function Code MA; (6) Zinc Chromate (Specific Risk); and (7) Aircraft Locking Devices (UH-60 Black Hawk), Activity Code 172, Function Code OM. Except for item 2, L-3 did not provide the relevant reference documents to Mr. Karol, and the training consisted of no more than Mr. Karol signing the CFT-405 forms - which took all of about ten seconds each.

39.     Mr. Karol personally observed answers being provided to other L-3 mechanics. For example, on February 2, 2010, at 12:44 hours, Mr. Karol was present when Thomas F. Johnson was scheduled to take a written test on Ground SPT Equipment Nitro SVC Cart FPNC-1. Mr. Karol's site supervisor, Tim Wagner, instructed Mr. Karol to prepare the materials for the test. Mr. Karol reported to Mr. Wagner that the test already had the answers marked on it and that it was not ethical to administer a test with answers on it. Mr. Wagner ignored Mr. Karol's observations and handed the test to Mr. Johnson, who copied the answers from the document onto his own CFT Form 405.

40.     Mr. Karol obtained, among others, completed, signed, and dated copies of CFT
Forms 405 for many L-3 mechanics.  For Example, (1) annexed hereto as Exhibit 10 are copies
of twenty-four CFT Forms 405 for Tire/Wheel Maintenance UH-60;  (2) annexed hereto as
Exhibit 11 are copies of twenty-eight CFT Forms 405 for Flight Control Rigging UH-60; and (3)
annexed hereto as Exhibit 12 copies of are twenty-nine CFT Forms 405 for Aircraft Jacking
UH-60.  As explained in the following paragraphs, these records confirm Mr. Karol's
observations regarding L-3's knowing falsification of test results and false certifications of the
proficiency of L-3 aircraft mechanics.

41.     For example, one L-3 mechanic failed to fill in *any* answers for his test on
Aircraft Jacking on UH-60s, yet the instructor certified that "the employee has demonstrated the
required knowledge and understanding." *See* Form CFT 405 for Christopher Monahan, Aircraft
Jacking UH-60, dated March 5, 2009 (in Ex. 12).  Another document demonstrates that the L-3
instructor certified an L-3 mechanic's proficiency on UH-60 Tire and Wheel Maintenance
despite the fact that the mechanic failed to answer half of the questions on the written test. *See*
Form CFT 405 for Kenneth Fuller, Tire/Wheel Maintenance UH-60, dated August 30, 2008 (in
Ex. 10).  The pattern of corrections on yet another mechanic's qualification record provides
further reliable indicia of the sham testing. *See* CFT Form 405 for David Frechette, Tire/Wheel
Maintenance UH-60, dated September 23, 2008 (in Ex. 10).  That document reveals that the test-
taker initially marked the same series of five answers onto two consecutive lines of answer
boxes, a mistake that would be improbable unless the individual was merely copying lines of
answers from one document to the other. *Id.*

42.     The extraordinarily high number of correct answers and perfect pass rates further
support Mr. Karol's observations that the tests were a sham and that L-3 certified its mechanics

as proficient without actually evaluating their proficiencies. All of the mechanics tested on Aircraft Jacking on UH-60s passed, and almost every one received a perfect score (correct answers were marked for 99% of the questions) (*See* Ex. 12). On the Tire/Wheel Maintenance UH-60 tests, only a single incorrect answer was marked. (*See* Ex. 10). All of the qualification records for Flight Control Rigging on 'UH-60s certified that the mechanics — on whom the service men and women of the United States Armed Forces relied — were qualified to perform that critical operation, including three mechanics whose tests went unscored. (*See* Ex. 11). Reasonably, one would expect that on occasion an L-3 mechanic would be unable to demonstrate proficiency of a particular process and would require additional training; however, Mr. Karol is unaware of any mechanic, in his seven years and ten months of working for L-3 in Iraq, ever failing a test given by L-3, except during the periods when Mr. Karol was in charge of training at Tal Afar.

44.    Since 2003, L-3 has created thousands of false Form 405 records certifying that its mechanics had completed the contractually-required training requirements pursuant to the SOPs approved by the United States. L-3's failure to comply with these mandatory training standards was much more than a mere technical violation of the contract. Commencing at least by 2003, L-3 failed to ensure that competent personnel performed the primary activity (*i.e.*, the repair and maintenance of aircraft) it was hired to do in Iraq and Afghanistan — a material breach of its contracts with the United States.

44.    Despite L-3's knowledge that the testing program was a sham and that the helicopter maintenance work was being performed by incompetent and improperly certified mechanics, L-3 knowingly submitted COCAs to the United States, falsely certifying that the work was being performed as required. *See* Ex. 5, samples of L-3 COCAs.

14

45.    L-3's practice of knowingly falsifying test results and falsely certifying the proficiency of its mechanics in order to obtain payment under its contracts with the United States were violations of the False Claims Act.  Further, L-3's false certifications of performance of the contract, and with the PWS's and the SOP's, likewise were violations of the False Claims Act. L-3's submission of claims for payment since 2003, in which it knowingly relied on these false reports, false certifications of proficiencies, and false certifications of performance, constituted violations of the False Claims Act.

46.    By engaging in this pattern of misconduct, L-3 not only made false claims for payments to which it was not entitled, but L-3 left to chance the safety of United States military personnel by failing to determine whether its mechanics were competent to perform critical aircraft maintenance and repair.

47.    L-3's misconduct was tragically confirmed when a Black Hawk helicopter which had been serviced by an L-3 CFT in the same hanger in which Mr. Karol worked, crashed in Iraq on August 22, 2007, killing all fourteen United States servicemen on board, including ten soldiers.  The crash occurred because an L-3 mechanic left a safety wire spool in the aircraft. The spool became wedged between the tail rotor drive shaft and the housing causing the drive shaft to fail.

### 3.    *False Time Charges for Testing of L-3 Mechanics*

48.    Because L-3 mechanics were not actually being tested on their qualifications, but were merely copying answers from one document to another, no productive work was being performed pursuant to L-3's contracts with the United States when these tests were administered, and the United States obtained no benefit from the activity as conducted.  L-3 charged the United States for creating false records by recording the time allocated for testing as time in which

15

employees were engaged in productive work. L-3's practice of charging the United States for time spent creating false qualification records constituted fraudulent billing.

49.     Further, because L-3 mechanics were provided with the answers to written tests, completion of each test took only approximately five to ten minutes rather than the hour that was typically allocated for written testing. The amount of time allocated for each test is noted on each CFT Form 405. (*See* Exs. 10, 11 and 12). L-3 charged the United States for the full time allocated for each test as productive hours, regardless of the actual time spent on testing. L-3's practice of charging the United States for more time than was actually taken to complete the tests constituted billing fraud.

50.     In order to understand these abuses, we offer the example of Matthew Beatty, an L-3 new hire who commenced working at Camp Sykes at Tal Afar on February 23, 2009, L-3 employee number 112715. Beatty's Time and Attendance Record for his first week at Camp Sykes, February 20, 2009 through February 26, 2009, is annexed hereto as Exhibit 13A. The Time and Attendance Record reveals that, after his first three days when he clocked only eight hours per day because he was travelling to Tal Afar, Beatty clocked the L-3 standard twelve hours per day. The CoSs for Camp Sykes for the week ended February 26, 2009, which are collectively annexed hereto as Exhibit 13B, reflect that no non-productive hours were recorded by any L-3 employee at Camp Sykes during the week ending February 26, 2009. The Labor Input Sheets for Camp Sykes for the week ending February 27, 2009, copies of which are collectively annexed hereto as Exhibit 13C, list all of the L-3 employees at Camp Sykes and demonstrate that each of the employees recorded 84 hours for the week, except a few, including Beatty. The records demonstrate that, on February 24, 2009, Beatty recorded twelve hours.

51.     Collectively annexed hereto as <u>Exhibit 13D</u> are CFT Forms 405 for Beatty allegedly showing that he received training on <u>fifty</u> (50) subjects from David Frechette on February 24, 2009.  According to those documents, the training Beatty received from Frechette on February 24, 2009, totaled 30.8 hours!!!  On eight of the subjects, Beatty was given written tests and scored 100% on each of them.  The documents also reveal that Beatty was required to read and familiarize himself with 140 references which Beatty signed as having read.

52.     Beatty's training records are a sham.  The only things that can be determined from those records are (i) Beatty was not trained for 30.8 hours on February 24, 2009, (ii) Beatty did not read the 140 references on February 24, 2009, (iii) L-3 billed the United States for twelve hours of Beatty's time on February 24, 2009, and (iv) the United States paid L-3 for twelve hours of Beatty's time on February 24, 2009.

## C.     **False Claims Resulting From L-3's Timekeeping Fraud**

53.     L-3 also engaged in the fraudulent practice of reporting that <u>all</u> CFT personnel worked the maximum number of hours possible -- 84 -- under L-3's contracts with the United States every week, and that all such personnel were engaged in productive work during every reported work hour, regardless of the workers' actual work status during those hours and regardless of the actual work demands.  L-3 fraudulently inflated the number of productive hours spent by its contract workers in Iraq and Afghanistan, in order to justify the payment of unnecessary overtime, and to create an artificial rationalization for the number of mechanics needed in Iraq and Afghanistan to perform aircraft repair and maintenance under the contracts.

### *1.     Requirements Regarding the Reporting of Work Hours by L-3*

54.     L-3's contracts with the United States, including, but not limited to, the 2009 Contract, were Time & Material ("T&M") contracts pursuant to which L-3 was to be paid for the

actual cost of its direct labor at specified hourly rates and the actual cost of material. The

contracts provided that:

> Under T&M line items, there is not a guarantee of hours. The
> Government shall be billed only for hours actually worked.

*See* Ex. 1 at page 2, Part I, Section B, Item 1.

55.   L-3's contracts with the United States, including, but not limited to, the 2009

Contract, provided that:

> APPROVAL OF OVERTIME AND EXTRA PAY SHIFTS AND
> PAYMENTS FOR WORK AT OVERTIME RATES/EXTRA
> PAY DIFFERENTIAL
>
> (a) Work performed under this contract shall be paid for at the
> straight time hourly rates as set forth in this contract except to the
> extent work is performed by direct labor personnel and is
> authorized as described in sub-paragraph (b) below.
>
> (b) The contractor is authorized to perform overtime hours or extra
> pay shift hours under the following conditions:
>
> * * * *
>
> (2) As otherwise approved in accordance with the
> "Payment under Time & Materials and Labor Hour contracts -
> (52.232-7)" or "Payments-(52.232-1)," Incentive Fee - (52.216-
> 10), Incentive Price Revision-Firm Target - (52.216-16) clauses of
> the General Provisions as authorized by the Administrative
> Contracting Officer (ACO) under the following conditions:
>
>> (i) Necessary to cope with emergencies such as
>> those resulting from accidents, natural disasters,
>> breakdowns of production equipment, or occasional
>> production bottlenecks of a sporadic nature;
>>
>> (ii) In the performance of tests, industrial processes,
>> laboratory procedures loading or unloading of
>> transportation media, and operations in flight or afloat,
>> which are continuous in nature and cannot be reasonably
>> interrupted or otherwise completed; or
>>
>> (iii) Which result in lower overall cost to the
>> Government (as determined by the ACO).

*See* Ex. 1, pages 54 through 55.

56.     L-3's contracts with the United States, including, but not limited to, the 2009

Contract, provided, in the Performance Work Statement ("PWS"), that:

> For all employees, the standard work week will be a minimum of
> 48 hours, with an additional 36 hours of OT per week possible for
> CFT employees with the approval of the local APO.

*See* Ex. 2, at page 3, paragraph 2.3.

57.     Contract Line Item Number ("CLIN") 0011 provided for labor necessary to

accomplish modifications, maintenance, and repair of aircraft in Iraq from February 2, 2009

through November 5, 2009 ("Basic Period") on a time and material basis. (Ex. 1, p. 12). *See*

*also* CLIN 0001, Basic Period-Afghanistan (*id.*, p. 2); CLIN 0006, Basic Period-Egypt (*id.*, p. 8);

CLIN 0016, Basic Period-Kuwait (*id.*, p. 17); CLIN 1001, Option 1, Year 2-Afghanistan (*id.*, p.

24); CLIN 1006, Option 1, Year 2-Egypt (*id.*, p. 26); CLIN 1011, Option 1, Year 2-Iraq (*id.*, p.

29); CLIN 1016, Option 1, Year 2-Kuwait (*id.*, p. 32); CLIN 2001, Option II, Year 3-

Afghanistan (*id.*, p. 35); CLIN 2006, Option II, Year 3-Egypt (*id.*, p. 38); CLIN 2011, Option II,

Year 3-Iraq (*id.*, p. 41); CLIN 2016, Option II, Year 3-Kuwait (*id.*, p. 44).

58.     L-3 was contractually required to deliver certain labor reports to the United States

on a regular basis, including: (1) a monthly status report summarizing type of work and man

hours expended; (2) a man hour utilization report; and (3) a manning/personnel status report.

These reporting requirements are set forth in Section 7.0 of the PWS. (*See* Ex. 2 at p. 18).

Additional requirements for reporting work hours are also set forth in L-3's SOP A-15, a copy of

which is annexed hereto as Exhibit 14.

59.     Each CFT employee was required to accurately record the actual time worked

against the applicable CLIN (which was charged to the United States) or against the appropriate

exceptional attendance code on the "Time and Attendance Record" each day. (SOP A-15,

Items 3(b) and (g), 5 in Ex. 13). Exceptional attendance codes were used to denote paid time

off, unpaid time off, and non-productive hours spent at the worksite. The site supervisor was

required to "monitor and verify employees' time and attendance." (SOP A-15, Item 3(f) in

Ex. 14). At the end of each work week, the employee was required to total the hours on the

record and to sign the completed form to certify "that the time was accurate, true, and complete."

(SOP A-15, Items 3(g), 5(t)(1) in Ex. 14). The employee's site supervisor was also required to

sign the form to certify that the time was "accurate, true, and complete." SOP A-15, Item

5(t)(2) in Ex. 14).

60.    Site supervisors prepared a Weekly Status Report ("WSR") and a Labor Input

Sheet each week. An example of a WSR is annexed hereto and made a part hereof as Exhibit

15A; an example of a Labor Input Sheet is annexed hereto and made a part hereof as Exhibit

15B. The WSR provided a weekly summary of hours expended, designating the hours as

productive or non-productive, as well as a running total of hours expended at a specific site for

that year. (*See* SOP P-4, annexed hereto and made a part hereof as Exhibit 16; LOI SWA P-01,

annexed hereto and made a part hereof as Exhibit 17). The Labor Input Sheet provided similar

information to that provided by the WSR, including the applicable task order, the hours worked

by each employee, and a code designating the hours as productive or non-productive, in an

electronic format. (*See* SOP A-16, annexed hereto and made a part hereof as Exhibit 18).

61.    Productive Hours included (1) time spent on the primary activity of maintaining

aircraft; and (2) time spent on "productive support" activities, such as work performed by site

supervisors, technical inspectors, supply clerks, and administrative assistants. (*See* SOP P-4 in

Ex. 16 and LOI SWA P-01 in Ex. 17).

62.    Non-Productive Hours included time in which an employee was not engaged in productive work because (1) the employee was "entering or exiting the Southwest Asia Theater on commercial flights"; (2) the employee was engaged in security clearance applications or processing in or out of base; (3) a worksite special holiday, other than an approved holiday, had been allowed; (4) aircraft were unavailable, such as when a worker was waiting for the customer to de-fuel or purge an aircraft; (5) United States furnished property, such as air compressors and power units, was lacking; and (6) inclement weather had interrupted work. (*See* LOI SWA P-01 in Ex. 17)).  A unique input box was provided on the WSR for each of the six non-productive hour categories.  (*Id.*)  An input box was also provided on the WSR for the site supervisor to report non-productive hours caused by other circumstances and to explain the specific reasons for the non-productive hours.  (*Id.*)

63.    The Labor Input Sheet was used to generate the Certificate of Service ("CoS"), which documented and certified the "manhours expended" by L-3 CFT personnel in accomplishment of contract work each week.  (*See* SOP A-16 in Ex. 17)).  The CoS identified each employee type (*e.g.*, inspector, aircraft mechanic) by line, the number of employees of each type, and the time worked, including straight time, overtime, double time, and total hours worked.  The hours worked were also broken down into productive hours and non-productive hours.  The CoS also provided space to explain non-productive time.  Examples of forty-one completed CoSs are collectively annexed hereto and made a part hereof as Exhibit 19. After verifying the documentation, the site supervisor signed the CoS, obtained the signature of the Government's local Project Officer ("PO"), and then forwarded the CoS to L-3 to be presented to the United States as the principal document evidencing a claim for payment

made to the United States.  None of the CoSs contained in Ex. 19 list <u>any</u> non-productive time despite the fact that space for non-productive time is provided.

64.    While each CoS was signed by the local PO, as were some other documents, PO's were military officers with line duties for whom the PO duties were a very small side line.  For example, the Tal Afar PO was CW5 James Houghton.  The L-3 site supervisor, Dan Utinske, said of Houghton: "CW5 Houghton the PO is a knowledgeable maintenance test pilot who doesn't have a desk and works nights so he can be difficult to find if you need him.  He is aware of the weekly reports he must sign and I created a folder that I leave on the desk, that contains the FFP COCA, COS's; he'll come in and sign them"  Memorandum from Dan Utinske to Tim Stout with a copy to Hughey Poppell, dated September 28, 2009, a copy of which is annexed hereto and made a part hereof as Exhibit 20.

65.    L-3 has acknowledged that accurate timekeeping and reporting is a necessity and a legal obligation, and that intentional labor mischarging constitutes fraud and violates 18 U.S.C. § 1001.  L-3 made this admission in a document entitled "Labor Charging—Your Responsibilities," a copy of which is annexed hereto and made a part hereof as Exhibit 21, at pp. 5-7.  In that document, L-3 also said that: "Our company charges the U.S. government and other customers millions of dollars every year for labor costs." *Id*. at p. 2.  Further, L-3 said that: "Labor charging is particularly important in OUR businesses, which deal primarily with U.S. government customers and are governed by the Federal Acquisition Regulations ('FAR')". *Id*. at p. 5.

66.    On April 18, 2005, Dave Carothers, L-3's Vice President of Contract Field Services, sent a memorandum, on "Time and Attendance Procedures" to Site Supervisors and a

variety of other L-3 personnel.  In his memorandum, a copy of which is annexed hereto and

made a part hereof as Exhibit 22, Carothers said:

> It has come to my attention that we have some employees who do
> not understand that we work on a time and material contract in
> CFT (as well as most of our non-CFT programs).  This means
> every hour recorded on the timesheets, as billable time, is invoiced
> to the government.

Carothers went on to say:

> I want you to ensure that your team members clearly understand
> the **seriousness** of time and attendance sheets and the
> **consequences** of misrepresenting their time worked.  They MUST
> understand that every one of their timesheets is an invoice to the
> government.

(Emphasis in original).

67.   Regardless of Carothers' statements, L-3 may argue that, despite the language of

its contracts with the United States, L-3 was required to keep its employees on the clock twelve

hours per day even if they had absolutely nothing to do, because of the exigencies of the SWA

Theater of Operations.  L-3 may argue that, because it did not know when the United States

would turn a helicopter over to it for service or repair, it was necessary to keep its personnel at

FOB's on the clock around the clock.  This argument is disingenuous at best.  The L-3 aircraft

mechanics working in the SWA Theater of Operations were based at FOBs which were locked

down and alcohol free.  In Mr. Karol's seven years and ten months working for L-3 in Iraq, Mr.

Karol only once lived more than one-half mile from where he worked on aircraft.

68.   In other words, the L-3 aircraft mechanics were always available to work on

aircraft maintenance and repair.  They simply had no place to go and they had nothing to do.

The contract provided that "[t]he Government shall be billed only for hours actually worked."  It

was not necessary to breach this material term in order to ensure that the mechanics were always

available when needed -- they were there anyway with nothing to do.

23

69.     Unfortunately, reality at L-3 was far different than expressed by Carothers.  Casey

Spillers, a site supervisor for L-3 in Iraq, wrote a memorandum, a copy of which is annexed

hereto and made a part hereof as <u>Exhibit 23</u>, in which he said:

> The purpose of this informal memo is to provide instructions on
> how to properly fill out the WSR which is turned in at the end of
> each pay period. . . .
>
> The WSR Form is broken into 4 major categories:  Productive
> Support; Project Support; Non-Productive hours; and hours billed
> against individual work orders.  **WE WILL NEVER FILL IN
> ANY TIME FOR NON-PRODUCTIVE HOURS.**

(Emphasis in original).  Spillers went on to say that:

> . . . Mechanics time not billed towards a work order shall
> also be documented under Project Support.

Finally, Spillers said:

> **<u>Non-Productive Hours</u>:**
>
> •     This block is used to account for time when there is absolutely
>       nothing to do.  No Aircraft Maintenance, Toolbox Inventories,
>       Parts Turn-in, cleaning, etc.  **WE WILL NEVER USE THIS
>       COLUMN.**

(Emphasis in original).

70.     On September 28, 2009, Dan Utinske wrote to Tim Stout and Hughey Poppell and

confirmed what Spillers had said:

> . . . at the end of the week I had a ready report of work orders and
> man hours expended against specific aircraft or efforts.  The
> balance that was not directly expended against work orders fell
> into "project support" meaning using LIS/T&A data I had total
> hours expended, subtracting the hours by type aircraft, and
> productive support "supervisors, leads and inspectors"; the balance
> is project support hours.

A copy of Utinske's memorandum is annexed hereto and made a part hereof as <u>Exhibit 24</u>.

### 2.    L-3's Falsification of Work Hour Reports

71.     In Mr. Karol's seven years and ten months in Iraq, he observed that the workload

for L-3 mechanics varied considerably from day-to-day and week-to-week. At times, helicopter

maintenance operations would remain on hold for extended periods of time while the crew

waited for the military to deliver a helicopter for maintenance. Operations were also shut down

for as long as three days at a time during the frequent sandstorms that plagued many of the FOBs

in Iraq. Operations would also commonly cease prior to the end of the daily shift simply because

the day's work had been completed. In each case, L-3 required its mechanics to remain "on

the clock" for the entire twelve-hour shift. In Mr. Karol's experience, it was not uncommon for

an entire maintenance crew of mechanics to remain on the clock for six or more additional

hours after all work had been completed for the day, in order to reach 12 hours of on-the-clock

time for that day. Mr. Karol observed this on a regular basis at all seven FOBs at which he

worked in Iraq.

72.     On or about March 5, 2010, Mr. Karol was transferred from Tal Afar to Tikrit

because the FOB in Tal Afar was closed by the United States. Upon his arrival in Tikrit, Mr.

Karol began keeping a shift-by-shift log of work being performed. Mr. Karol worked on the

second shift from 6:30 p.m. local time to 7:00 a.m. local time the following morning. He worked

on a OH-58D Kiowa Team which shared a hanger with a UH-60 Black Hawk Team. Mr.

Karol's OH-58D Kiowa Team consisted of five mechanics, and the UH-60 Black Hawk Team

consisted of nine mechanics.

73.     The following is a summary of Mr. Karol's observations recorded in his log for

the period from March 5, 2010 through March 21, 2010:

- March 5, 2010 - Mr. Karol arrived in Tikrit. After processing in and
  getting situated, he reported to his worksite. Mr. Wright provided Mr.
  Karol and Gilbert Garcia, another new arrival, a brief tour of the hanger.

The OH-58D Kiowa Team had no aircraft to work on and was milling about making small talk, or watching movies or playing games on their I-Pods. Mr. Karol and Mr. Garcia offered their assistance to the UH-60 Black Hawk team, who were busy working on an aircraft. After spending about thirty minutes assisting the Black Hawk Team pulling panels in the cockpit, Mr. Karol and Mr. Garcia spent the rest of the evening performing no work.

- March 6, 2010 - No aircraft for the Kiowa team. The entire crew spend the shift "milling around the general area and getting cat naps in the break room."

- March 7, 2010 - Once again, no aircraft/no work.

- March 8, 2010 - No aircraft/no work.

- March 9, 2010 - The Kiowa team received its first aircraft since Mr. Karol's arrival (Tail Number 70-102). The work order requested a "100% inspection" of the helicopter. The entire team worked all night with no down time.

- March 10, 2010 - The entire team worked all night continuing the inspection.

- March 11, 2010 - Another full night of work for the team.

- March 12, 2010 - Another full night of work for the Kiowa team.

- March 13, 2010 - Another full night of work for the Kiowa team.

- March 14, 2010 - Kiowa team discovered that the Main Roter Mast on the helicopter was worn. The repair required a special tool to be flown in from Kirkuk, Iraq. The second-shift did not work from midnight until the end of the shift while waiting for the tool. The Black Hawk team had no aircraft or work.

- March 15, 2010 - The Kiowa inspection discovered a cracked bracket in the tail section. The repair required a part to be shipped from Dothan, Alabama. After the discovery, the Kiowa team performed no work while waiting for the part. The Black Hawk team had no aircraft or work.

- March 16, 2010 - The Kiowa team performed no work while waiting for the part. The Black Hawk team had no aircraft or work.

- March 17, 2010 - The Kiowa team continued to perform no work while waiting for the part. The Blackhawk team had no aircraft or work, but sent two of its nine mechanics to assist another Black Hawk team located

on base.

- March 18, 2010 - The Kiowa team continued to perform no work while waiting for the part. The Blackhawk team had no aircraft or work, but sent two of its nine mechanics to assist another Black Hawk team located on base.

- March 19, 2010 - The Kiowa team continued to wait for the part. At the beginning of the shift, Mr. Wright held a meeting where he discussed safety issues related to relief valves on nitrogen servicing carts. At the end of this short meeting Mr. Wright said, "it's obvious that we don't have any maintenance work tonight and you know what that means." The Kiowa team spent the remainder of the shift milling about and playing with their I-Pods. The Black Hawk team had no aircraft or work.

- March 20, 2010 - No report.

- March 21, 2010 - The Kiowa team continued to wait for the part and performed no work. The Black Hawk team received an aircraft for phase maintenance and expected to be busy for the next twelve days.

74.     While each of L-3's mechanics in Iraq and Afghanistan was guaranteed 48 hours of work each week, L-3 required each mechanic to record 84 hours of work each week - - 48 hours of straight-time and 36 hours of overtime. As Mr. Karol's log demonstrates, Mr. Karol and most, if not all, of the mechanics in his hanger in Tikrit during the period from March 5 through March 21, 2010, were paid overtime on March 6, 7, 8, 14, 15, 16, 17, 18, 19 and 21 to do nothing. Annexed hereto and made a part hereof as Exhibit 25, is a typed summary of Mr. Karol's log from March 5, 2010, to June 30, 2010. During that four month period, Mr. Karol observed and documented over 4,000 manhours of downtime, including over 3,000 hours of overtime, in a single hanger, at a single base in Iraq. All of those hours were billed to the United States as "Project Support" hours despite the fact that the 2009 Contract expressly provided that: "The Government shall be billed only for hours actually worked." (*See* Ex. 1).

75.     Regardless of the number of actual hours of work performed or required, and despite SOPs requiring that actual hours of work be accurately reported, L-3 required all CFT

personnel in Iraq and Afghanistan to report 84 hours (48 straight-time hours and 36 overtime hours) of productive work on the Time & Attendance Records each and every week, almost without exception. This has been L-3's policy and practice at every base, and for the entire time, that Mr. Karol worked for L-3 in Iraq. Eighty-three completed Time and Attendance Records, seventy of them reporting 84 hours of productive work weekly, are collectively annexed hereto as examples and made a part hereof as <u>Exhibit 26</u>.

76.     WSRs further evidence that L-3 avoided reporting any nonproductive hours, and instead categorized all man hours as productive regardless of their actual status. For example, in the column showing running "to-date" totals on the August 6, 2009 WSR for Tal Afar (*see* Ex. 14), under the 2009 Contract, L-3 reported a total of 53,177.5 productive hours worked to date (through August 6, 2009), including 24,531 aircraft maintenance hours, 22,375.5 project support hours, and 8,709.5 productive support hours. Not a single hour of non-productive time was reported for the entire period. The total hours worked to date as noted on the WSRs dated September 24, 2009,  copies of which are collectively annexed hereto and made a part hereof as <u>Exhibit 27</u>, reported 80,237.2 productive hours and zero non-productive hours. On the WSRs dated December 27, 2007, a copy of which is annexed hereto and made a part thereof as <u>Exhibit 28</u>, and September 25, 2008, a copy of which is annexed hereto and made a part hereof as <u>Exhibit 29</u>, under the 1997 Contract, L-3 also reported zero non-productive hours. In fact, collectively annexed hereto as examples and made a part hereof as <u>Exhibit 30</u> are copies of thirty-eight WSRs, <u>none</u> of which report any non-productive hours.

77.     As a direct and proximate result, every L-3 document from Afghanistan and Iraq that quantifies the amount of productive versus non-productive time worked by L-3 mechanics, including, but not limited to, the Time and Attendance Records, Weekly Status Reports and

Certificates of Service, are false and fraudulent. Those false and fraudulent documents were used by L-3 to make false and fraudulent claims for payment to the United States as a result of which the United States, commencing in at least 2002 and continuing until at least 2011 made payments totaling hundreds of millions of dollars to L-3 in payment of L-3's false and fraudulent claims.

### 3.   *L-3's Fraudulent Practice of Billing for Time Performing Non-Contractual Tasks*

78.   L-3 also knowingly presented false and fraudulent claims for payment to the United States for time spent performing tasks that are not included in its contracts with the United States. Such activities include laundry runs and administrative food runs.

79.   At the Tal Afar FOB, L-3 sent two aircraft mechanics to pick up and drop off the personal laundry of L-3 employees at the FOB's laundry facilities twice each week. For example, letters signed by L-3 Site Supervisor David Frechette authorizing certain L-3 mechanics, including Mr. Karol, to make laundry runs on behalf of the entire L-3 CFT at Tal Afar are annexed hereto and made a part hereof as Exhibit 31 and Exhibit 32 respectively. Each of those laundry trips took approximately one hour to complete. L-3 recorded and reported the time spent on laundry runs as Productive Hours, despite the fact that handling personal laundry did not fall within the scope of Productive Hours.

80.   Similarly, L-3 sent one or more mechanics on an administrative food run to pick up several dozen cases of food and drink from a military warehouse located on the base at least twice per month. Annexed hereto and made a part hereof as Exhibit 33 is a December 26, 2009 memorandum from L-3 requesting food items for one such food run. Each food run took at least one L-3 mechanic over an hour to complete. L-3 recorded and reported time spent on

administrative food runs as Project Support Hours, despite the fact that this type of work did not fall within the scope of Project Support.

## CLAIMS OF RELIEF

**FIRST CLAIM FOR RELIEF**
**VIOLATIONS OF THE FALSE CLAIMS ACT**
**31 U.S.C. §3729(A)(1)(b) [For Violations On Or After June 7, 2008**
**And Former 31 U.S.C. §3729(a)(2) [For Violations Prior To June 7, 2008]**

81.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 80 of this Complaint as if set forth herein at length.

82.    The False Claims Act, 31 U.S.C. § 3729(a)(1)(B) (2009 Acts. Pub.L. 111-21, §4(f), May 20, 2009, 123 Stat. 1625, [Section 3729 effective June 7, 2008]) imposes liability on any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim."

83.    Former Section 3729(a)(2) (effective for violations prior to June 7, 2008) imposed liability on any person who "knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government."

84.    By reason of the foregoing, L-3 violated 31 U.S.C. § 3729(a)(1)(B) and former 31 U.S.C. § 3729(a)(2) by knowingly implementing a scheme to fraudulently administer proficiency tests to L-3 aircraft mechanics and by falsely certifying that L-3 aircraft mechanics had demonstrated the required knowledge and understanding of various processes and tasks:

a.    By knowingly making false records of hours in which L-3 mechanics were engaged in productive work by categorizing time allocated for testing as productive hours when the tests were a sham;

b.    By knowingly making false records of hours by instructing L-3 mechanics to record 84 productive work hours each week and by certifying that they had worked 84 hours of productive work each week when they had not so performed or so worked;

c.    By knowingly making false records of hours worked by automatically

billing hours for certain tasks regardless of whether such tasks were actually performed and by knowingly certifying that L-3 employees had performed the work which was automatically billed when they had not so performed or so worked; and

d.     By knowingly making false records of time spent performing tasks that are not included in L-3's contracts with the United States, including laundry runs and administrative food runs.

85.     Each of the false records created and maintained by L-3, as alleged in paragraph 84, *supra*, was material to the United States' decision to pay L-3 because the false records influenced and were capable of influencing the payment of money.  L-3's false records of productive work hours, as set forth in paragraph 84 *supra*, also misrepresented and inflated the demand for CFT personnel and overtime and therefore influenced the United States to pay for unnecessary overtime and to continue to fund an artificially and unnecessarily high number of aircraft mechanics in Iraq and Afghanistan.

**SECOND CLAIM FOR RELIEF**
**VIOLATIONS OF THE FALSE CLAIMS ACT,**
**31 U.S.C. § 3729(a)(1)(A)**

86.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 80 and 82 through 85 of this Complaint as if set forth herein at length.

87.     The False Claims Act, 31 U.S.C. § 3729(a)(1)(A), formerly codified at 31 U.S.C. §3729(a)(1), imposes liability on any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval,"

88.     By reason of the foregoing, L-3 violated 31 U.S.C. § 3729(a)(1)(A) by presenting or causing to be presented to an employee of the United States false or fraudulent claims for payment or approval under its contracts with the United States to provide helicopter maintenance and repair services.

89.     L-3's claims for payment were also false and fraudulent because they were based upon false certifications of compliance and/or performance.

## RELIEF REQUESTED

WHEREFORE, Plaintiff Steve Karol, on behalf of himself and the United States, demands:

(1)     Judgment in favor of the United States and against L-3 in an amount equal to three times the amount of damages the United States sustained because of L-3's actions, pursuant to § 3729(a)(1) of the FCA, plus a civil penalty of up to $11,000.00, but not less that $5,500.00 (as adjusted pursuant to § 3729(a)(1) of the FCA), to the United States for each and every act of L-3 in violation of the FCA, and the costs of this action, with interest, including the costs to the United States for its expenses related to this action;

(2)     Judgment awarding Mr. Karol all costs incurred, including his attorneys' fees and court costs;

(3)     Judgment awarding Mr. Karol an amount for collecting the civil penalties and damages for the United States of at least 25% but not more than 30% of the proceeds paid to the United States resulting from the trial or settlement of the claim, pursuant to § 3730(d)(2) of the FCA;

(4)     Judgment awarding Mr. Karol prejudgment interest; and

(5)     Judgment awarding the United States and Mr. Karol such other, further and different relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Mr. Karol respectfully requests a trial by jury of all facts so triable.

Dated:    June 11, 2012

MILBERG LLP

By: _____
    James M. Shaughnessy
    A Member of the Firm
    Admitted *pro hac vice*
One Pennsylvania Plaza
New York, New York  10119
Telephone:  (212) 594-5300
Facsimile:  (212) 868-1229
jshaughnessy@milberg.com

Bill E. Davidoff, Esq.
**FIGARI & DAVENPORT, L.L.P.**
3400 Bank of America Plaza
901 Main Street
Dallas, Texas  75202-3796
Telephone:  (214) 939-2000
Facsimile  (214) 939-2090
bill.davidoff@figdav.com

*Co-Counsel for Plaintiffs United States of America and Steve Karol.*